ELLEN M. BAKER & others, trustees, *vs.* Z. ADAMS WILLARD & another, trustees.

HARRIET N. LOWELL *vs.* SAME.

Suffolk. January 27, 28, 1898. — May 20, 1898.

Present: FIELD, C. J., ALLEN, KNOWLTON, LATHROP, & BARKER, JJ.

*Equity — Obstruction of Easement.*

A. owned a mansion house, the land appurtenant to which was bounded easterly by T. Street, southerly by B. Street, and northerly by an open court about twenty feet wide, extending to his western boundary, and also owned by A. On the northerly side of the court he owned three dwelling-houses, facing southerly, and occupied by his married daughters. His mansion house, having an ell extending westwardly, stood about three feet from the court, separated from it by a fence six feet high, in which was no opening. Five windows of the mansion house opened on the court, in which was a drain used by all four

houses. At his death A. devised the three dwelling-houses on the court to his daughters severally in fee, with the "respective privileges and appurtenances by them at the day of the signing of this will respectively occupied and improved," and devised his mansion-house to his wife for life, remainder to his son W., subject to the condition that they should personally occupy the same, " it being my design that the family establishment shall continue as much as possible unchanged," and the residue of his estate, including the open court, equally to his children. A.'s son W. having died, the mansion-house estate was conveyed by his administrator to D., who subdivided the estate, and conveyed two of the lots created by such subdivision and fronting on B. Street to E. and F. The lots owned by E. and F. both bounded northerly on the open court, and both were west of the most westerly of the windows of the mansion-house, which, before its removal, had opened on the court, and no other buildings formerly standing on the mansion-house estate had depended on the court for light or air. The owners of the open court and of the land devised to A.'s daughters proceeded to erect a building over the court, leaving open only a covered foot passageway, and thereupon E. and F. sought to restrain such erections. *Held,* that the testator A. created no further easement in respect to keeping the court open above the surface of the ground than the ordinary easement of light and air for the benefit of the mansion-house estate, and that this easement was limited to the mansion-house itself, and did not extend to the land owned by E. and F.

An administrator who, under leave of the Probate Court, conveys land of his intestate, bounding it " in part on a court," which was owned by his intestate with others as tenants in common, does not create by estoppel a right to have the court left open.

TWO BILLS IN EQUITY, filed April 17 and 24, 1896, respectively, by the owners of two parcels of land on Beacon Street in Boston, marked X and Y on the plan given below, to restrain

the defendants, who, as well as the plaintiffs, derived their title through successive conveyances from Samuel Eliot, who died in 1820, from obstructing the light and air over a certain passage-way leading off of Tremont Street, or from erecting buildings over the same.

The case was referred to a master, and on the coming in of his report was heard on the pleadings, master's report, and exhibits, by *Allen*, J., who, at the request of the parties, reserved the case for the consideration of the full court. The material facts appear in the opinion.

*L. S. Dabney & E. W. Hutchins*, (*L. I. Partridge* with them,) for the plaintiffs.

*S. Lincoln & W. A. Munroe*, (*H. H. Sprague* with them,) for the defendants.

ALLEN, J. We will consider in the first place the nature and extent of the supposed original right which the plaintiffs respectively seek to establish. This right had its origin in the provisions of the will of Samuel Eliot, who died in 1820. He was the owner of the estate in Boston on the corner of Beacon and Tremont Streets, bounding south on Beacon Street, and east on Tremont Street. His mansion-house faced on Tremont Street, and the land immediately connected with it was bounded southerly by Beacon Street, and northerly by an open court or space about twenty feet wide, and extended westerly to his boundary line. On the northerly side of the open court or space he had built three brick dwelling-houses, which faced southerly, and were then occupied respectively by three of his daughters, with their husbands. Mr. Eliot's mansion-house stood about three feet south of the southerly line of the court, having an ell which extended westwardly on the same line with the mansion-house. Five of the windows of the mansion-house looked upon the court, and two rooms were entirely dependent on these windows for light ; but there was no entrance or communication between the mansion-house estate and the court, there being between them a fence six or seven feet high, in which there was no opening. There was a drain through the court, which was used for all the four houses.

Mr. Eliot by his will devised to the said three daughters, " severally and respectively, the brick dwelling-houses and their respective privileges and appurtenances by them at the day of

the signing of this will respectively occupied and improved, each to have and to hold their houses and estates thereto belonging now in their occupation, to them, their heirs and assigns forever." He devised the mansion-house estate as follows: " It is my will that my wife Catherine Eliot and my children who may reside with her shall have the use of my present mansion-house, and also the free use of all my plate, furniture, stores of every description in the house, and my horses and carriages, for their full enjoyment, without being responsible for any loss, consumption, or wear or injury of the same to my other children, it being my design that the family establishment shall continue as much as possible unchanged. The said devise of the mansion-house to my wife for life is on the condition that she shall continue to reside therein personally as the mistress thereof. . . I give the reversion thereof to my son William Havard Eliot, his heirs and assigns forever." After sundry other bequests and devises, not here material, he devised all the residue of his estate equally to his children, of whom there were seven. The will contained no specific devise of the land between the three dwelling-houses and the mansion-house estate. At that time, as found by the master, the preservation of the space between the mansion-house and the three new brick houses as an open court was important, if not indispensable, to the convenient and accustomed enjoyment of the mansion-house in respect of light and air, so long as the mansion-house should be continued in the state and situation in which it then was.

On October 20, 1829, the widow of Samuel Eliot died, and William H. Eliot thereupon became, under his father's will, the owner in fee of the mansion-house estate, subject to the condition that he should personally occupy the same. By mesne conveyances the title to the westerly brick dwelling-house had come to Timothy H. Carter, who erected a building upon the westerly portion of the court; and William H. Eliot thereupon brought a writ of entry against him to recover one seventh part of the land. This case went to the full court, and by the decision, reported in 12 Pick. 436, it was held that the fee of the court did not pass to the testator's three daughters under the devise of the three dwelling-houses, but to his seven children under the general residuary clause. This decision was given on April 6, 1832, as we infer from the date in the margin of the volume.

In the opinion, the court, in speaking of the open space, says : " There are some considerations which have led us to the conclusion, that it was the intention of the testator to devise an easement and not a fee. He manifested in his will a great attachment to the mansion in which he had long lived, and a strong desire that it should be continued in the state and situation in which it then was. The preservation of the space between that and the three new brick houses, as an open court, was important if not indispensable to the convenient and accustomed enjoyment of the mansion-house. . . . We cannot by possibility believe that the testator intended to devise the upper houses without a right of way to the street. . . . We are of opinion that it was the intention of the testator to preserve an open court there for the benefit and convenience of the adjoining houses, to give the respective owners thereof an easement in the court for various purposes." *Eliot* v. *Carter*, 12 Pick. 436, 442.

It was also then agreed, (and the same fact is found and reported in the present case by the master,) that the court was never used by the testator as a passageway to his mansion-house estate, nor in any other way in connection with it, except for light and air for the windows, and for the drain. The right of drainage is now immaterial.

It is thus apparent that it was then considered that by the will of Samuel Eliot some easement or right in respect to light and air from the open space was annexed to the mansion-house estate, but the extent of it was not defined in that decision. The present plaintiffs contend that it was something more than the ordinary easement of light and air for the windows and doors of existing buildings, and that it amounted to a general right to have the space kept open for the whole extent of the court as it then was.

There is no doubt that under some circumstances provision may be made by owners of land for keeping certain spaces open generally, for light, air, prospect, and other purposes of convenience and enjoyment, without attaching this right to particular buildings. Open squares may be dedicated to public purposes. *Abbott* v. *Cottage City.* 143 Mass. 521. And in making plans for the improvement and development of lands, provision is often made for keeping certain spaces open ; of which illustrations may be found in *Brooks* v. *Reynolds*, 106 Mass. 31,

*Salisbury* v. *Andrews*, 128 Mass. 336, and in numerous other reported cases. So that the question is, What was the testator's intention in this case? Such a restriction is to be interpreted according to the apparent purpose of protection or advantage to the several estates concerned. *Smith* v. *Bradley*, 154 Mass. 227. *Hano* v. *Bigelow*, 155 Mass. 341.

In the present case, we find no satisfactory evidence to show that the testator sought to create any further protection or advantage to the mansion-house estate, in respect to light and air, than the ordinary easement of that kind. It does not appear that he had any further building scheme in mind, or that he contemplated the cutting up of his mansion-house estate into separate lots. What he had at heart was, as expressed in his will, " that the family establishment shall continue as much as possible unchanged." The court in *Eliot* v. *Carter*, 12 Pick. 436, mentions as significant his strong desire that the mansion " should be continued in the state and situation in which it then was." No intention is manifested to provide for the benefit of additional buildings to be thereafter erected. So far from making any provision for light, air, or prospect for future structures, he left the easement in favor of his existing dwelling to be gathered from implication. He speaks of his mansion-house, but says nothing in express terms of the land connected with it except in one instance he mentions the " house and land thereto properly belonging." His interest attached to the dwelling place as it was, and he made no provision looking to its division into separate building lots. The plaintiffs have failed to show an intention on the part of the testator to create any further easement, in respect to keeping the court above the surface of the ground open, than the ordinary easement of light and air for the benefit of the mansion-house estate as it then was. *Leech* v. *Schweder*, L. R. 9 Ch. 463, 473.

We have then to consider whether the plaintiffs are entitled to the benefit of such an easement, assuming for the present that the easement in its original extent has not been extinguished by merger or otherwise.

William H. Eliot having died, his administrator, under leave of the Probate Court, conveyed the mansion-house estate in 1833 to Israel Thorndike. In this deed, the land conveyed was

bounded northeasterly " in part on a court called Phillips Place." It is suggested in argument that these words created by estoppel a right to have the court kept open.    But this deed was made by an administrator, who was selling land under a license of the Probate Court.    He was not at that time selling the testator's interest in the open court, and perhaps he never would do so. We are not aware that it has ever been held that under such circumstances an administrator could impose an easement on other land which he was not then selling, nor under the circumstances do we think that an intention to create such an easement should be inferred.    Moreover, even assuming that the administrator had all the powers of the testator, the latter at his death owned only one undivided seventh part of Phillips Place, and, he being only a tenant in common, could not have created such an easement without the consent of his cotenants.    *Clark* v. *Parker*, 106 Mass. 554.    See also Jones, Easements, § 224, and cases there cited.

The estate was subdivided by Thorndike, who in 1835 conveyed the lot now owned by Mrs. Lowell, one of the present plaintiffs, by deed to Stowell.    This lot is now No. 2 Beacon Street, rectangular in shape, and has twenty-six feet front on Beacon Street.    The easterly boundary line is about sixty-three feet west of Tremont Street at the front, and somewhat farther at the rear.    The lot now owned by the other plaintiffs is No. 4 Beacon Street, lying westwardly from Mrs. Lowell's lot and separated by an intervening lot; and this lot was also conveyed by Thorndike in 1835 to a different purchaser, Lovejoy.    The ell of the mansion-house reached back at least nearly to the easterly line of what is now Mrs. Lowell's lot, and perhaps extended a very few feet over that line, it being impossible now to determine exactly where the westerly wall of the ell stood. All the windows which looked upon the court were, however, east of the boundary of that lot.    The stable and other outbuildings stood farther back from the court, and it does not appear that they depended on the court for either light or air. Upon these facts, it is quite obvious that the easement of light and air was limited to the mansion-house.    This easement does not exist in favor of a vacant piece of ground, unless by virtue of provisions or circumstances clearly showing an intention to that effect.    We need not now go nicely into the question of the

exact rules for determining the measure of this right in favor of new structures, in cases where the original building has been pulled down or altered, (as to which see *Scott* v. *Pape*, 31 Ch. D. 554, and *Greenwood* v. *Hornsey*, 33 Ch. D. 471,) because the easement created in this case did not extend so far as to include either of the lots of land now owned by the plaintiffs. The plaintiffs contend that an easement appurtenant to a close is appurtenant to every parcel into which that close may be divided. This is usually so in respect to a right of way. *Whitney* v. *Lee*, 1 Allen, 198. Washb. Easements, (4th ed.) 59. But the doctrine is not applicable to an easement of light and air, which ordinarily is limited to windows and doors, or other apertures in a building. Gale, Easements, (6th ed.) 289, 290, 298–300, 506, 507. Goddard, Easements, (5th ed.) 51–53, 263–265, 289, 368. 2 Washb. Real Prop. (5th ed.) 362 *et seq.* Washb. Easements, (4th ed.) 493–501. If all other points are assumed in favor of the plaintiffs, they fail to show that any easement of light or air was created by the will of Samuel Eliot or otherwise, in favor of those parts of his estate which they now own. No such easement was necessary for the enjoyment of those parts of the estate, and an implied grant of an easement is not to be extended by construction beyond what was necessary, or what is fairly shown to have been within the intention of the creator of it. *Carbrey* v. *Willis*, 7 Allen, 364, 369. *Parker* v. *Bennett*, 11 Allen, 388, 392. *Badger* v. *Boardman*, 16 Gray, 559. *Jewell* v. *Lee*, 14 Allen, 145. *Sharp* v. *Ropes*, 110 Mass. 381. *Dalton* v. *Angus*, 6 App. Cas. 740. *Moore* v. *Hall*, 3 Q. B. D. 178. *Scott* v. *Pape*, 31 Ch. D. 554. *Harris* v. *De Pinna*, 33 Ch. D. 238. *Aldin* v. *Latimer*, [1894] 2 Ch. 437.

Thorndike's deeds to Stowell and Lovejoy each contained a grant of " the right of passage to and from the rear of said lot through Phillips Place to Tremont Street, which is guaranteed only for foot persons and of a width of not less than three and one half feet." The defendants admit that the plaintiffs respectively are entitled to this easement, but the plaintiffs have failed to show that they are entitled to have the passage kept open to the sky. *Burnham* v. *Nevins*, 144 Mass. 88, and cases there cited.

This view of the case being decisive in favor of the defendants, we do not consider the other questions argued.

*Bills dismissed.*